IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GINGER RHOADS; SCOTT RHOADS; ASHLEY ETHRIDGE; and WAYLON ETHRIDGE, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GUILFORD COUNTY, NORTH CAROLINA; GUILFORD COUNTY DEPARTMENT OF SOCIAL SERVICES; SHARON BARLOW, in her individual and official capacity as Director of Guilford County Department of Social Services; GAIL SPINKS; CHRISTINA HAIK; KAREN WILLIAMSON; LORI GERSHON; RACHEL COOLEY; DSS SUPERVISOR DOE #1, in his or her individual and official capacity as an employee of Guilford County Department of Social Services; and DSS SOCIAL WORKER DOE #1, in his or her individual and official capacity as an employee of Guilford County Department of Social Services, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

1:23-CV-854

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In this putative class action, Plaintiffs allege race-based discrimination in the placement of foster children. Before the court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 26.) Plaintiffs have responded

in opposition (Doc. 31), and Defendants have replied (Doc. 35). For the reasons set forth below, the motion to dismiss will be granted.

## I.   BACKGROUND

On December 19, 2023, the court granted in part Defendants' motion to seal portions of the complaint to protect the identities of minor children involved. (Doc. 23.) The court need not rely on any redacted allegations to resolve the motion to dismiss and accordingly refers here solely to the publicly-available redacted version of the complaint at docket entry 24. The facts alleged therein, which the court accepts as true for the purpose of the motion to dismiss, set out the following:

Defendant Guilford Department of Social Services ("Guilford DSS") is a subdivision of Defendant Guilford County, a division of the North Carolina state government amenable to suit under North Carolina General Statute § 153A-11. (Doc. 24 ¶ 7.) Defendant Sharon Barlow is the Director of Guilford DSS, and Defendants Gail Spinks, Christina Haik, Karen Williamson, Lori Gershon, Rachel Cooley, DSS Supervisor Doe #1, and DSS Social Worker Doe #1 are Guilford DSS employees. (Id. ¶ 8.) These individuals are all sued in their respective official and individual capacities.

Plaintiffs are two sets of white foster parents. Plaintiffs Scott and Ginger Rhoads reside in Alamance County, North Carolina,

2

and have fostered numerous children. (Id. ¶ 5.) Minor 1[1] is an African American child who was placed in the Rhoadses' care by Guilford DSS. (Id.) They cared for Minor 1 for twenty-eight months. (Id. ¶ 14.) At some point during this period, it "became clear" that Minor 1 would require permanent adoption. (Id.) The Rhoadses allege that Defendants "participated in and actively advanced" efforts to have Minor 1 removed from their home and that Minor 1's mother's attorney, the guardian ad litem, and the child's attorney "pushed the court to remove the child." (Id.) The Rhoadses further allege that Defendants "aided and abetted" efforts by the guardian ad litem and Minor 1's attorney to have Minor 1 adopted by an African American household. (Id. ¶ 15.)

The Rhoadses' claim is supported solely by comments by Minor 1's attorney and the guardian ad litem — neither of whom is employed by any Defendant or sued in this case — at a hearing to respond to the removal request. The Rhoadses allege that the guardian ad litem told the judge that Minor 1 should be placed in "his own culture," that Ms. Rhoads called him by an "uppity" nickname, that the Rhoadses could not receive sufficient assistance to help them understand African American culture, and that Mrs. Rhoads committed "microaggressions" when discussing her opinions regarding Minor 1's hair care. (Id. ¶ 15.) In a

---

[1] The complaint capitalizes the anonymizations as "MINOR X." The court adapts the anonymizations as "Minor X" throughout.

3

permanency planning hearing on April 12, 2022, the guardian ad litem opined:

> I just feel like these are things that, [Minor 1] being an African-American male, could hurt him in the long run. He needs to be exposed to culture; he needs to be able to be around children that look like him; he needs to be able to be around teachers who look like him, and I feel like he's not going to get that if he gets adopted by the Rhoadses, even though they're great people.

(Id. ¶ 16.)[2]

---

[2] This quotation appears in the complaint. Defendants previously moved to file under seal what they represent are the complete transcripts from this and other removal proceedings involving the minors in this case; this court granted Defendants' motion. (Docs. 29 at 1–2; Doc. 36 at 1–2; see Docs. 28, 28-1 (transcripts).) Defendants now argue these transcripts show that Plaintiffs' excerpted quote is misleadingly taken out of context and that reasons other than race drove the state court's removal decision. (Doc. 27 at 21–24.) Notably, no party points to any portion of the transcripts of the minors' removal proceedings to argue that they contain any evidence to support Plaintiffs' claims in this case; rather, the transcripts contain information involving placement of the minors that is protected as confidential under North Carolina law. See N.C. Gen. Stat. §§ 7B-302, 7B-2901; 10 N.C. Admin. Code 70A.0113. For the reasons noted infra, the court concludes that the transcripts are unnecessary for resolution of the pending motion to dismiss. However, because the Fourth Circuit recently held in the summary judgment context that the court must nevertheless determine the propriety of sealing even where the sealed documents bore no role in the court's consideration, United States ex rel. Oberg v. Nelnet, Inc., 105 F.4th 161 (4th Cir. 2024), further discussion is warranted, and this court's prior order (Doc. 36) is supplemented accordingly.

The confidentiality of records filed in judicial proceedings represents an exception to the "general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). This right of public access derives from both the common law and the First Amendment. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 576 (4th Cir. 2004). The common law right provides a "presumption of access" which may be rebutted "by a showing that countervailing interests heavily outweigh the public interests in access." Oberg, 105 F.4th at 171 (internal quotation marks and citation omitted). A court may restrict access to a document

4

protected by the First Amendment "only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" <u>Id.</u> (footnote and citation omitted). And "[w]hile the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." <u>Stone v. Univ. of Md. Med. Sys. Corp.</u>, 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted).

The First Amendment right attaches only "to any judicial proceeding or record (1) that has historically been open to the press and general public; and (2) where public access plays a significant positive role in the functioning of the particular process in question." <u>Oberg</u>, 105 F.4th at 171 (internal quotation marks and citation omitted). This standard is clearly met in connection with an opposition to summary judgment and related documents, even to those documents on which the trial court did not rely in reaching its summary judgment decision. <u>Id.</u> at 172-74.

The present case involves a motion to dismiss pursuant to Rule 12(b)(6). While "public access plays a significant positive role in the functioning of the particular process in question" here, <u>id.</u> at 171, such a motion involves a judicial determination of the sufficiency of a complaint without resolution of "contests surrounding the facts, the merits of a claim, or the applicability of defenses," <u>Burgess v. Goldstein</u>, 997 F.3d 541, 562 (4th Cir. 2021) (citation omitted). There are limited circumstances where documents referenced in the complaint can be considered without converting the motion to one for summary judgment. <u>Jenkins v. United States</u>, No. CV 3:17-1775-TLW-PJG, 2018 WL 1720926, at *3 (D.S.C. Mar. 12, 2018) ("[T]he district court cannot go beyond [the complaint and documents attached or incorporated therein] on a Rule 12(b)(6) motion; if it does, it converts the motion into one for summary judgment.") (quoting <u>E.I. du Pont de Nemours & Co. v. Kolon Indus.</u>, 637 F.3d 435, 448 (4th Cir. 2011)) (alterations in original), <u>report and recommendation adopted</u>, No. 3:17-CV-1775-TLW-PJG, 2018 WL 1709921 (D.S.C. Apr. 9, 2018), <u>aff'd</u>, 778 F. App'x 227 (4th Cir. 2019); <u>cf.</u> <u>Phillips LCI Int'l., Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999) (explaining that, on a motion to dismiss, a court may consider a document not attached to the complaint where the document was "integral to and explicitly relied on in the complaint" and its authenticity is unchallenged). The transcripts offered by Defendants do not fall within those limited circumstances, and they would therefore ordinarily not be considered at this stage.

Although it does not appear to be settled whether First Amendment access rights attach to documents filed in support of a motion to dismiss, <u>see Oberg</u>, 105 F.4th at 173 n.10 (discussing <u>In re Policy</u>

The Rhoadses allege that Defendants "failed to make any objection to this racially-biased testimony; aided, abetted, and acquiesced in its presentation; acquiesced in the Court's ruling based on that testimony; and made no effort to appeal the Court's erroneous ruling." (Id. ¶ 17.) They also allege that Defendants have not convened a review or permanency hearing to "address this racially discriminatory result," despite "being advised of this violation." (Id. ¶ 18.)

Plaintiffs Ashley and Waylon Ethridge reside in Charleston County, South Carolina. (Id. ¶ 6.) They cared for two African

_____

Management Systems Corp., Nos. 94-2254 & 94-2341, 1995 WL 541623, at *3-4 (4th Cir. Sept. 13, 1995) (unpublished)), the court can assume, without deciding, that the more stringent First Amendment access rights apply. That is because here there is a compelling government interest in sealing the transcripts: the protection of children. Globe Newspaper Co. v. Superior Ct. for the Cnty. of Norfolk, 457 U.S. 596, 607-08 (1982) (finding that "safeguarding the physical and psychological well-being of a minor [qualifies as] a compelling [interest]" that can outweigh the public's right of access). North Carolina law protects the interests of minors by providing that the records of certain juvenile cases, including those relating to dependency, be "withheld from public inspection and . . . may be examined only by order of the court." N.C. Gen. Stat. § 7B-2901(a) (2021). Moreover, sealing the transcripts, where the pertinent basis for Plaintiffs' claim appears already in the complaint, is narrowly tailored to serve that compelling interest. North Carolina law requires that the hearing transcripts be closed to public inspection. See N.C. Gen. Stat. §§ 7B-302, 7B-2901; 10A N.C. Admin. Code 70A.0113. This court has previously sealed the records of nonparty minors after finding that "a compelling interest in protecting the minors' privacy outweighs the public's right of access to those materials [under both the common law and First Amendment]." Vang v. Ashby, No. 1:18CV565, 2020 WL 5764388, at *4, *5 (M.D.N.C. Sept. 28, 2020).

Therefore, continued sealing of the transcripts is warranted. This is true even though the court did not rely on their contents to resolve the present motion.

6

American children, Minor 2 and Minor 3, who are siblings. (Id. ¶ 20.) Guilford DSS personnel had initiated "numerous conversations" with the Ethridges about adopting the children. (Id.) Before a "key court hearing" in July 2021, Guilford DSS personnel inquired of the Ethridges how they planned to support a minor's "'cultural' needs" and to maintain a connection to the mother's religion, which is Islam, and to "cultural food, events, and hairstyles." (Id. ¶ 21.) At the hearing, the attorney for Minors 2 and 3 — who is neither a party to this case nor employed by any Defendant — "interrogated" Mrs. Ethridge about "racial issues." (Id.) The Ethridges alleged that Defendants "aided, abetted, and acquiesced in the Court's removal of [Minors 2 and 3] from the Ethridges on racial grounds." (Id. ¶ 22.)

Plaintiffs plead three substantive counts on behalf of themselves and others similarly situated: (1) violations of 42 U.S.C. § 1983 and the Multi-Ethnic Placement Act of 1994 ("MEPA"), codified at 42 U.S.C. §§ 671(a)(18), 1996b; (2) violations of 42 U.S.C. § 1983, as interpreted by Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978); and (3) a conspiracy to violate civil rights in violation of 42 U.S.C. §§ 1985 and 1986. (Doc. 24 ¶¶ 32-39.) Plaintiffs also plead "counts" for injunctive relief, monetary damages, and attorneys' fees predicated on the merits of their three substantive counts. (Id. ¶¶ 40-42.) As to injunctive relief, Plaintiffs seek an order

7

(1) returning Minor 1 to the Rhoadses and Minors 2 and 3 to the
Ethridges and to "allow[] them to become potential adoptive
parents . . . without fear of retaliation"; (2) appointing an
independent, court-selected monitor to review the current
practices of Guilford County DSS with regard to MEPA compliance;
and (3) requiring that Guilford County take steps to change its
policies and practices to ensure MEPA compliance.  (Id. ¶ 40.)
Defendants move to dismiss the complaint pursuant to Federal Rules
of Civil Procedure 12(b)(1) and (6), arguing multiple grounds.
(Doc. 26.)  The motion is fully briefed and ready for resolution.

## II.  ANALYSIS

### A.    Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a
pleading must contain "a short and plain statement of the claim
showing that the pleader is entitled to relief."  Fed. R. Civ. P.
(8)(a)(2).  A Rule 12(b)(6) motion to dismiss is meant to "test[]
the sufficiency of a complaint" and not to "resolve contests
surrounding the facts, the merits of a claim, or the applicability
of defenses."  Republican Party of N.C. v. Martin, 980 F.2d 943,
952 (4th Cir. 1992).  To survive such a motion, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'"  Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quotation marks and citation omitted). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

As to a Rule 12(b)(1) motion, a court must consider its subject matter jurisdiction as a "threshold matter" prior to addressing the merits of the case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005). "The plaintiff has the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 647 (4th Cir. 1999) (citing Richmond,

_Fredericksburg & Potomac R.R. Co. v. United States_, 945 F.2d 765, 768 (4th Cir. 1991)). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" _Id._ (quoting _Richmond, Fredericksburg & Potomac R.R. Co._, 945 F.2d at 768). "The district court should grant the Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" _Id._ (quoting _Richmond, Fredericksburg & Potomac R.R. Co._, 945 F.2d at 768).

**B. Motions to Dismiss**

**1. MEPA and Private Right of Action**

MEPA is codified in two places in the United States Code. First, under 42 U.S.C. § 1996b,

> (1) A person or government that is involved in adoption or foster care placements may not—
>
> (A) deny to any individual the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the individual, or of the child, involved; or
>
> (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

"Noncompliance with paragraph (1) is deemed a violation of title VI of the Civil Rights Act of 1964." _Id._ § 1996b(2). Title VI,

10

in turn, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Second, under 42 U.S.C. § 671(a)(18), MEPA sets out nearly identical standards as under section 1996b:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the [Health and Human Services] Secretary which
>
> . . .
>
> (18) . . . provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may—
>
> (A) deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or
>
> (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved[.]

In the complaint, Plaintiffs allege violations of both sections 1996b and 271(a)(18) in some paragraphs but, under Count I, only cite section 1996b. (Doc. 24 ¶¶ 1, 17, 32.) In any event, Defendants have not argued that either codification of MEPA is unenforceable via an express or implied private right of action and/or via a section 1983 claim. (See generally Doc. 27;) see 42

11

U.S.C. § 674(d)(3)(A) (providing for cause of action for individual aggrieved by violation of 42 U.S.C. § 671(a)(18)). Because, as explained below, the court dismisses the complaint on alternative grounds, it assumes without deciding that a private right of action is available both directly through MEPA and through a parallel action pursuant to a 42 U.S.C. § 1983 claim. See Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166, 183-84 (2023) (citing Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)) (discussing circumstances in which a federal statute confers a cause of action under section 1983). Nevertheless, the assumed existence of a private cause of action under MEPA does not obviate any separate substantive requirements under a parallel section 1983 claim predicated on a MEPA violation, and the court will consequently consider the parallel claims separately. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257-58 (2009) (stating that the "standards for establishing liability may not be wholly congruent" where a plaintiff alleges a parallel section 1983 claim).

### 2. Rule 12(b)(1) Motion and Rooker-Feldman Doctrine

Defendants first argue that the complaint should be dismissed pursuant to Rule 12(b)(1) because Plaintiffs seek federal court review of a final state court judgment, in violation of the Rooker-

12

_Feldman_ doctrine.[3]  (Doc. 27 at 9-10.)  The doctrine "prohibits federal courts from adjudicating cases brought by state-court losing parties challenging state-court judgments."  <u>Reed v. Goertz</u>, 598 U.S. 230, 235 (2023).  However, "where the federal complaint presents an 'independent claim,' even 'one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"  <u>Jonathan R. by Dixon v. Justice</u>, 41 F.4th 316, 340 (4th Cir. 2022) (quoting <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 293 (2005)).  Moreover, "state administrative and executive actions are not covered by the doctrine — even where ratified, acquiesced in, or left unpunished by a state-court decision."  <u>Id.</u> (internal quotation marks and citations omitted).

Here, while Plaintiffs' claims arise out of state court proceedings, the lion's share of the allegations and requested relief is directed at conduct beyond the state court judgments themselves.  Plaintiffs do seek one specific form of injunctive relief among several — namely, reversal of the state court decision awarding custody to persons other than themselves — that would challenge a final state court judgment.  (Doc. 24 ¶ 40 (seeking an

---

[3]  Named after <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983), the doctrine is appropriately raised on a Rule 12(b)(1) motion because it relates to the court's subject matter jurisdiction.

13

"order returning the children to Plaintiffs' foster homes").)
While issuing that specific remedy would be barred under Rooker-
Feldman, the court does not otherwise lack subject matter
jurisdiction over Plaintiffs' claims. Defendants' motion to
dismiss on this ground will therefore be granted in part and denied
in part.

### 3. Rule 12(b)(6) Motion

#### a. Claims Against Guilford DSS

Defendants contend that any claims against Guilford DSS must
be dismissed because it is not capable of being sued under North
Carolina law. (Doc. 27 at 10.) Plaintiffs concede this point in
their complaint and response in opposition to Defendants' motion.
(Doc. 24 ¶ 7; Doc. 31 at 7-8.) The claims against Guilford DSS
will therefore be dismissed.

#### b. Monell Claim

The court turns next to Plaintiffs' section 1983 claim against
Guilford County under Monell, 436 U.S. 658. Defendants argue that
the Monell claim against Guilford County should be dismissed
because Plaintiffs do not plausibly allege a "policy, custom, or
practice of the County that caused the alleged MEPA violation."
(Doc. 27 at 26.) In response, Plaintiffs argue that Guilford
County's MEPA violations "resulted from a wider policy" but do not
cite to any allegations in the complaint in support. (Doc. 31 at
21-22.)

14

In Monell, the Supreme Court held that a plaintiff may sue a municipality under section 1983 for a "federal constitutional deprivation only when the municipality undertook the allegedly unconstitutional action pursuant to an 'official policy' or 'custom.'" Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 533 (4th Cir. 2022) (quoting Monell, 436 U.S. at 690-91). The Fourth Circuit has enumerated four ways in which Monell liability may arise:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (internal quotation marks and citation omitted). In their briefing, Plaintiffs rely only on the last ground – a persistent and widespread practice that constitutes a custom or usage. (Doc 31 at 21-22.)[4]

---

[4] The complaint alleges that Defendant Barlow is the "final social services policymaker for Guilford County" and that "to the exten[t] any Defendant [] claims ignorance of the requirements of MEPA-IEP," Guilford County failed to "properly train employees of Guilford DSS" in "deliberate indifference to the rights of citizens." (Doc. 24 ¶¶ 24, 34.) While Plaintiffs fail to identify any policy allegedly adopted by Barlow and Defendants do not claim ignorance of the requirements of MEPA, Plaintiffs raise neither of these grounds in their response, and thus these grounds are deemed abandoned. See Mentch v. E. Savings Bank, FSB, 949 F. Supp. 1236, 1247 (D. Md. 1997) (deeming a claim abandoned where plaintiff failed to address it in her opposition to defendant's motion for summary judgment).

Establishing liability under the "custom or usage" method is "no easy task" because "[s]poradic or isolated violations of rights will not give rise to Monell liability." Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 402-03 (4th Cir. 2014). To establish custom or usage liability, a plaintiff must show that a "pattern of comparable practices has become actually or constructively known to responsible policymakers." Howard v. City of Durham, 68 F.4th 934, 952 (4th Cir. 2023) (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987)). "In other words, a custom or usage can support Monell liability only if its continued existence can be laid to the fault of municipal policy-makers, and a sufficient causal connection between the municipal custom and usage and the specific violation can then be established." Id. at 952-53 (internal quotation marks and citation omitted). More specifically, a municipality is liable where "(1) the municipality [has] actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there [is] a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." Id. at 953 (quoting Randall v. Prince George's Cnty., 302 F.3d 188, 210 (4th Cir. 2002)) (internal quotation marks and citation omitted).

Here, Plaintiffs allege that the "repeated" MEPA violations "were part of a pattern and practice that was widespread and

16

persistent within the child welfare, foster care, and adoption work carried out by Defendants to the extent that it constituted a custom or usage with the force of law." (Doc. 24 ¶ 33.) Aside from the allegations related to the Rhoadses and Ethridges, however, Plaintiffs allege no facts to support the conclusion that the conduct is "widespread" or part of a "pattern." See Howard, 68 F.4th at 954 (describing as fatal to the Monell claim that the plaintiff offered evidence of "only a single incident of unconstitutional activity: the incident in this very case"). The conclusory allegation that the conduct is widespread does not lead to a reasonable inference that Guilford County had actual or constructive knowledge. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Accordingly, Plaintiffs' Monell claim under Count Two will be dismissed for failure to plausibly allege a policy or custom of Guilford County.[5]

### c.  Section 1983, 1985, and 1986 Claims

The court turns next to Plaintiffs' claims under 42 U.S.C. §§ 1983, 1985, and 1986. Section 1983 prohibits the deprivation of federal rights by any person acting under color of state law.

---

[5] Even if Plaintiffs alleged a custom or usage under Monell, they failed to state a Monell claim predicated on a MEPA violation for the reasons set forth relating to the MEPA claim, infra. Thus, the dismissal will be with prejudice. See Cozzarelli v. Inspire Pharmaceuticals, Inc., 549 F.3d 618, 630-31 (4th Cir. 2008) (affirming dismissal with prejudice where "amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability").

17

42 U.S.C. § 1983. Section 1985 prohibits a conspiracy to deprive individuals of their civil rights. 42 U.S.C. § 1985. Under section 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995). Section 1986 is "derivative of § 1985." Strickland v. United States, 32 F.4th 311, 360 (4th Cir. 2022) (quoting Park v. City of Atlanta, 120 F.3d 1157, 1160 (11th Cir. 1997)). Section 1986 "provides a cause of action against anyone who has knowledge of a § 1985 conspiracy and who, 'having the power to prevent or aid in preventing the commission of' acts pursuant to that conspiracy, 'neglects or refuses so to do.'" Id. (quoting 42 U.S.C. § 1986).

It is unclear whether Plaintiffs raise section 1983 claims against each individual Defendant, in addition to the section 1985 and 1986 claims. (Doc. 24 ¶ 32 (citing 42 U.S.C. § 1983 but not specifically alleging which Defendants the claim is raised against).) The court nevertheless broadly construes the complaint to allege section 1983, 1985, and 1986 claims against each individual Defendant predicated on alleged violations of MEPA. (Doc. 24 ¶¶ 32, 35.)

Defendants contend that Plaintiffs' section 1983, 1985, and

18

1986 claims must be dismissed because the individual Defendants are entitled to absolute immunity for these claims. (Doc. 27 at 12-13.) Plaintiffs respond that Defendants have not exercised prosecutorial functions such that absolute immunity applies. (Doc. 31 at 15-16.)

In determining state official immunity, courts employ a "functional approach" — i.e., the court must assess the nature of each alleged wrong, rather than the identity of the actor, to determine whether and what type of immunity attaches. Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993). The Fourth Circuit has held that state social services workers are entitled to absolute immunity for "activities . . . that could be deemed prosecutorial" in nature. Vosburg v. Dep't of Soc. Servs., 884 F.2d 133, 138 (4th Cir. 1989). In the criminal context, prosecutorial activities are those that are "intimately associated with the judicial phase of the criminal process." Van de Kamp v. Goldstein, 555 U.S. 335, 342-43 (2009) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). In Vosburg, the Fourth Circuit applied Imbler's absolute prosecutorial immunity to social workers who decided to file a child removal petition with the court. 884 F.2d at 134, 138. There, the court reasoned that the public policy considerations present in Imbler applied with equal force for social workers engaged in prosecutorial functions:

> Like a prosecutor, a social worker must exercise her
> best judgment and discretion in deciding when to file a
> Removal Petition. The welfare of the state's children
> would be jeopardized if social workers had to weigh their
> decision in terms of their potential personal liability.
> In short, the denial of absolute immunity here has the
> potential to adversely affect the efficient functioning
> of the state's child welfare system. Additionally, the
> chances are high that suits against the social workers
> would occur with some degree of regularity. Parents,
> resentful of and humiliated by an attempt to usurp their
> rights, would likely channel their frustration "into the
> ascription of improper and malicious actions to the
> State's advocate."

Id. at 137 (quoting Imbler, 424 U.S. at 425); see also Meyers v.
Contra Costa Cnty. Dept. of Soc. Servs., 812 F.2d 1154, 1157 (9th
Cir. 1987) ("The social worker's independence, like that of a
prosecutor, would be compromised were the social worker constantly
in fear that a mistake could result in a time-consuming and
financially devastating civil suit.").

State social services officers do not have absolute immunity
for all acts, however.  Where the conduct is administrative or
investigative, rather than prosecutorial, such officers may be
entitled to qualified immunity.  See Vosburg, 884 F.2d at 138.
For example, in Chambliss, the Fourth Circuit held that social
services officials were entitled to qualified immunity where they
involuntarily removed a minor from her natural mother's home and
placed her in a foster home where she died from trauma to the head.
White by White v. Chambliss, 112 F.3d 731, 733-34, 736-37 (4th
Cir. 1997).  "Qualified immunity shields government officials from

civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Atkinson v. Godfrey, 100 F.4th 498, 504 (4th Cir. 2024) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

Here, the Rhoadses allege that Defendants failed to "make any objection to . . . racially-biased testimony; aided, abetted, and acquiesced in its presentation; acquiesced in the Court's ruling based on that testimony; and made no effort to appeal the Court's erroneous ruling." (Doc. 24 ¶ 17.) They also allege that Defendants have not "convene[d] a review or permanency hearing before the Court." (Id. ¶ 18.) The Ethridges similarly allege that Defendants "aided, abetted, and acquiesced in the Court's removal of both children from the Ethridges on racial grounds" and have "failed and refused to take action within their power to remedy the intentional racial discrimination." (Id. ¶ 22.) They also allege that, prior to the removal hearing, Defendants "inquir[ed] of the Ethridges" how they would support the child's "cultural" needs. (Id. ¶ 21.)

Plaintiffs have cited no authority to support a finding that these activities are anything but prosecutorial in nature. Plaintiffs contend that Vosburg cabins absolute immunity to situations where "safety concerns" are present for removal proceedings (Doc. 31 at 15), but nowhere in Vosburg did the Fourth

21

Circuit limit absolute prosecutorial immunity to public safety cases or removal proceedings. Indeed, the Vosburg court's discussion of Imbler belies Plaintiffs' position, as the relevant policy considerations do not make public safety or removal at all necessary factors. Vosburg, 884 F.2d at 137. Moreover, Plaintiffs allege that these are removal proceedings. (Doc. 24 ¶¶ 3-4.)[6]

Plaintiffs' allegations (1) that Defendants did not object to and aided and abetted the presentation of allegedly discriminatory testimony, (2) that Defendants "acquiesced" in and did not appeal the court's ruling, and (3) that Defendants did not "convene a review or permanency hearing before the Court" are plainly prosecutorial in nature because they are "intimately associated with the judicial phase of the [removal] process." Van de Kamp, 555 U.S. at 342-43 (citation omitted). As to the presentation of testimony, the Supreme Court has made clear that absolute immunity applies to the elicitation of testimony, even where the testimony is false. Imbler 424 U.S. at 416, 430-31; Carter v. Burch, 34 F.3d 257, 263 (4th Cir. 1994) (applying absolute immunity to allegation that prosecutor was "involved in a conspiracy to present false testimony"). As to the allegations involving the decision to appeal, such decisions are "at the core of the prosecutorial

---

[6] While Plaintiffs observe that investigative activities only give rise to qualified immunity, they do not argue that there is any specific allegation in the complaint that would fall into the investigative category. (Doc. 31 at 15-16.)

22

function." Whitfield v. City of Philadelphia, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008). Accordingly, Defendants are entitled to absolute immunity for this alleged conduct.

The parties do not address the appropriate immunity framework to apply to the allegation that, prior to a removal hearing, Defendants "inquir[ed]" of the Ethridges' plans to provide for the "cultural" needs of a minor. (Doc. 24 ¶ 21.) Even assuming that only qualified immunity applies because this conduct is arguably investigative, see Vosburg, 884 F.2d at 138, Plaintiffs have not alleged that this inquiry alone amounts to illegal conduct, let alone a violation of "clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). While Plaintiffs appear to imply that qualified immunity should not generally apply in this case because MEPA expressly prohibits some conduct (Doc. 31 at 16), they neither argue nor cite any authority to support the proposition that Defendants' mere inquiry of the Ethridges is proscribed by MEPA, clearly or otherwise. Section 1996b prohibits the denial or delay of a placement based on the Constitution-protected factors noted, but an inquiry into "cultural needs" in a removal investigation is not expressly prohibited. Accordingly, even if qualified immunity, rather than absolute immunity, applied to the inquiry of the Ethridges, Plaintiffs' section 1983, 1985, and 1986 claims are barred.

23

Finally, while the complaint makes only conclusory and/or speculative allegations regarding inadequate training and omissions by senior Guilford DSS officials (Doc. 24 ¶¶ 34-39), Supreme Court precedent squarely forecloses an individual liability claim on this basis. In Van de Kamp, the Court stated that "a suit charging that a supervisor made a mistake directly related to a particular trial [by a prosecutor], on the one hand, and a suit charging that a supervisor trained and supervised inadequately, on the other, would seem very much alike." Van de Kamp, 555 U.S. at 346. This followed, in the Court's view because a "'faulty training' claim . . . rests in necessary part upon a consequent error by an individual prosecutor." Id. Accordingly, while Plaintiffs do not allege any facts regarding Guilford DSS's training, even if they had, the claim could not survive because it rests entirely upon specific alleged errors by subordinates. Plaintiffs' claims against the individual Defendants in their individual capacity under Counts One and Three will therefore be dismissed.

In addition, the complaint does not plausibly allege a section 1985 conspiracy against any Defendant. "[T]he law is well settled that to prove a section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." Strickland, 32 F.4th at 360-61 (alteration in original) (citation omitted). The plaintiff

24

must allege a "single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." Id. at 361 (citation omitted). The Fourth Circuit has rejected purported conspiracies that are alleged "in a merely conclusory manner, in the absence of concrete supporting facts." Id. (citation omitted). Here, the complaint's conspiracy allegations are entirely conclusory and devoid of any factual support. (Doc. 24 ¶ 36 (merely enumerating elements of conspiracy under Strickland)); Iqbal, 556 U.S. at 678.[7] Accordingly, the section 1985 conspiracy, Count III will be dismissed against all Defendants, including to the extent Plaintiffs intend to allege Guilford County was a member of, or had knowledge of, the conspiracy.[8]

### d. MEPA Claim

Lastly, the court addresses Plaintiffs' MEPA claim against

---

[7] Moreover, Defendants rightfully challenge Plaintiffs' group-pleading practice. (Doc. 27 at 16.) "Courts in this circuit have said that the group-pleading approach . . . may run afoul of federal pleading requirements." Bryant v. Core Contents Restoration, LLC, No. 7:20-CV-40, 2021 WL 1207719, at *11 (E.D.N.C. Mar. 30, 2021). Indeed, "the repeated refrain that all [defendants] committed each and every act must be read as an allegation that one of the[m] did each act, an assertion that amounts to speculation and which is deficient under Twombly." Proctor v. Metro. Money Store Corp., 579 F. Supp. 2d 724, 744 (D. Md. 2008).

[8] Similarly, for the reasons set forth for the MEPA claim, infra, Plaintiffs fail to state section 1983, 1985, and 1986 claims against any Defendant because these claims are predicated entirely on violations of MEPA for which Plaintiffs have failed to state a claim.

25

Guilford County.[9]  As noted above, Plaintiffs at times allege violations of both 42 U.S.C. § 271(a)(18) and 42 U.S.C. § 1996b. The two statutes contain the same material language.  In Count I, Plaintiffs cite to section 1996b, which provides:

> (1) A person or government that is involved in adoption or foster care placements may not—
>
>    (A) deny to any individual the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the individual, or of the child, involved; or
>
>    (B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

42 U.S.C. § 1996b(1).[10]

Guilford County contends that none of its officers took any action based on Plaintiffs' race.  (Doc. 27 at 21.)  In addition, it claims that the state court's decision to remove the children supersedes any causation that might theoretically be attributable to Guilford County.  (Id. at 20-24.)[11]  Plaintiffs respond that,

---

[9] The claims against the individual Defendants in their respective official capacities are effectively claims against Guilford County. Hafer v. Melo, 502 U.S. 21, 25 (1991) (stating that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" (internal quotation marks and citation omitted)).

[10] The court assumes without deciding that this statute covers removals from existing foster parents, as Defendants do not argue that it does not.

[11] Guilford County also maintains, in reliance on the full transcripts from which Plaintiffs selectively quoted in the complaint, that the

26

as to the Ethridges, Guilford DSS personnel asked questions that "were of a racial nature and implied that the Ethridges, as a white family, could not properly provide a permanent home for a black child." (Doc. 31 at 18 (citing Doc. 24 ¶ 21).) As to the Rhoadses, Plaintiffs argue that Guilford DSS "made no objection to highly racially-charged statements" during a removal hearing. (Doc. 31 at 18 (citing Doc. 24 ¶¶ 14-17).) They contend that Guilford DSS's "silen[ce]" shows "agreement with the racial animus of the other participants in the foster care process." (Doc. 31 at 19.)

By Plaintiffs' own admission, "there is a dearth of decisions specifically applying the prohibitions on racial discrimination in foster and adoptive placements." (Doc. 31 at 7.) Despite the novelty of their claim, Plaintiffs do not advocate for the court to proceed under any existing legal framework applicable to related anti-discrimination schema. Rather, Plaintiffs rely on alleged direct evidence of discriminatory intent. Cf. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015) ("It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by means of the McDonnell Douglas burden-shifting framework."); see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 198 n.2

---

allegations ignore that factors other than race drove the removal decision. (Id. at 21-22.) As noted above, the court resolves the motion to dismiss without reference to these transcripts.

(2023) (citing <u>Gratz v. Bollinger</u>, 539 U.S. 244, 276 n. 23 (2003)) (discussing congruence between Title VI claims and Equal Protection claims); 42 U.S.C. § 1996b(2) (tying MEPA to Title VI).

Accepting Plaintiffs' factual allegations as true, they do not amount to a plausible MEPA violation by Guilford County. Importantly, MEPA's proscription is directed to "delay[ing] or deny[ing] the placement of a child for adoption or into foster care" on the basis of race. 42 U.S.C. § 1996b(1)(B);[12] cf. <u>Muldrow v. City of St. Louis</u>, 601 U.S. 346, 354-55 (2024) (noting, in Title VII context, that a statute's description of the necessary injury "circumscribes the injuries that can give rise to a suit"). Rather than attribute to Defendants any harm against which MEPA protects, Plaintiffs' own complaint alleges that <u>the state court</u> ordered the removal of the children — i.e., the putative MEPA "denial." (Doc. 24 ¶¶ 17, 22.) But Plaintiffs never allege the state courts' bases for their removal orders beyond a bare assertion that the judge's decision in Minor 1's case was "based on [racially biased] testimony," and in Minors 2 and 3's case was "on racial grounds." (<u>Id.</u> ¶¶ 17, 22.)[13] While the court must draw all reasonable

---

[12] Section 1996b(1)(A), the statutory counterpart, prohibits "deny[ing] . . . the opportunity to become an adoptive or a foster parent" on the basis of race. 42 U.S.C. § 1996b(1)(A). Plaintiffs do not explain what it means to deny an opportunity to become an adoptive or foster parent, or how this provision might operate differently than section 1996b(1)(B). (<u>See generally</u> Doc. 31.)

[13] This is despite the fact that Plaintiffs apparently have access to the

28

inferences in Plaintiffs' favor at this stage, it is a "leap of faith simply too great" to infer that a state court judge would base his or her decision on illegal, racially-motivated grounds, especially when Plaintiffs do not allege <u>any</u> facts to support the bases for the judges' respective decisions. <u>Wray v. City of Greensboro</u>, No. 1:09-CV-00095, 2013 WL 4494460, at *11 (M.D.N.C. Aug. 19, 2013). Even if the court assumed that Guilford DSS conspired with witnesses to present racially discriminatory testimony, which would be merely speculative, the complaint still does not allege any facts to plausibly support the notion that the court removed the children from Plaintiffs' home "on the basis" of race. Accordingly, Plaintiffs do not plausibly attribute any alleged harm to the conduct of Defendants.

The complaint also contains only one allegation that Defendants took any affirmative act that might demonstrate they were considering the race of the minors: namely that, prior to a court hearing, "DSS personnel began inquiring of the Ethridges how they planned to support the child's 'cultural' needs and specifically requested to know how the Ethridges were going to maintain the child's connection with his mother's religion [(Islam)], and cultural food, events, and hairstyles." (Doc. 24 ¶ 21.) Notably, MEPA does not consider religion. 42 U.S.C.

---

transcript of the hearing in Minor 1's case. (Doc. 24 ¶ 16 (excerpting from transcript).)

§ 1996b. But more importantly, Plaintiffs do not allege what these questions were or that these questions were even pretextual. (Doc. 24 ¶ 21.) Plaintiffs do contend in their response brief that they "believe" these questions were "to create a pretext for removing the children" (Doc. 31 at 18),[14] but the complaint does not allege that Guilford DSS's out-of-court inquiries played any role whatsoever in the court's decision to remove the children. (Doc. 24 ¶ 22 (alleging, without any discussion of what occurred at the hearing, that the children were removed "on racial grounds").)

Moreover, Plaintiffs rely on certain omissions of Guilford DSS lawyers — e.g., not objecting to "racially-charged" testimony of the guardian ad litem at a removal hearing, not appealing the court's removal orders, etc. — to allege discriminatory intent by Guilford County. But Plaintiffs have cited no case, even from other statutory contexts, to support the position that these kinds of omissions are indicative of discriminatory intent. (See Doc. 31 at 16-20.) And considering the allegations cumulatively, the complaint fails to plausibly link these omissions to racial animus of Guilford County with factual allegations. Rather, Plaintiffs repeatedly rely on legal conclusions and/or bare assertions that the court must not accept as true. Giarratano, 521 F.3d at 302.

_____

[14] It is "axiomatic . . . that a plaintiff may not amend his complaint in his response brief." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 448 (7th Cir. 2011).

For instance, they allege that Defendants "participated in and actively advanced" removal efforts for Minor 1, but they do not at all allege what Defendants actually did or whether they were motivated by race in doing so. (Doc. 24 ¶ 14.) They also allege that Defendants "aided and abetted" the "racially-biased" testimony of Minor 1's guardian ad litem, but they do not allege that any Defendant played any role in eliciting or preparing the testimony. (Id. ¶¶ 15-17; see also id. ¶ 22 (same).) As noted above, Plaintiffs allege that Defendants "acquiesced in the Court's ruling based on that testimony," but they do not allege any facts to support their allegation that the state court impermissibly considered race. (Id. ¶ 17.) Absent any factual allegations to allow a reasonable inference that any Guilford County employee acted with discriminatory intent, Plaintiffs have failed to state a MEPA claim. Accordingly, the MEPA claim will be dismissed.[15]

### e. Counts Four, Five, and Six

Counts Four, Five, and Six of the complaint seek injunctive relief, monetary relief, and attorneys' fees. (Doc. 24 ¶¶ 40-42.) These counts do not plead any independent legal claims; rather, they are predicated on the merits of the first three counts.

---

[15] The parties contest the appropriate statute of limitations for the MEPA claim. (Doc. 27 at 11; Doc. 31 at 8.) Because the complaint is dismissed on other grounds, the court need not reach this issue.

Because the first three counts will be dismissed, counts Four, Five, and Six will likewise be dismissed.

## III. CONCLUSION

For the reasons stated, therefore, as to Defendants' motion to dismiss (Doc. 26),

IT IS ORDERED that to the extent the complaint seeks reversal of the state court's judgments as to custody of the minors, the claim is DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.

IT IS FURTHER ORDERED that as to all remaining claims, the motion is GRANTED and the complaint is DISMISSED.


              /s/   Thomas D. Schroeder
              United States District Judge
September 27, 2024